# PAUL MEGINNISS

### *vs.*

## IDA MEGINNISS.

*Suit for Alimony—Abandonment—Custody of Children.*

On a bill by defendant's wife for alimony, *held* that, defendant having, without justification, ceased living with plaintiff, he having positively and unequivocally stated that he would not again live with her, and it appearing that she was willing to resume marital relations, she was entitled to the relief sought.

p. 45

In a suit by defendant's wife for alimony, *held* that the lower court properly ordered defendant to pay to plaintiff the sum of twenty-five dollars a week as permanent alimony, for the support of herself and one of the two children of the marriage.

pp. 41, 46

On a bill by defendant's wife for alimony, *held* that the lower court properly awarded the custody of one of the two children to plaintiff, and of the other to defendant's mother, the court retaining jurisdiction over both children, and allowing reasonable access by each parent to each child.

pp. 41, 46

*Decided June 27th, 1923.*

Appeal from the Circuit Court of Baltimore City (DUFFY, J.).

Bill by Ida Meginniss against Paul Meginniss. From the order granted, defendant appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Abram C. Joseph,* with whom was *Daniel C. Joseph* on the brief, for the appellant.

*Eugene O'Dunne,* submitting on brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is a proceeding instituted by the appellee against the appellant in the Circuit Court of Baltimore City to secure alimony for the support of herself and the maintenance of her oldest child.

In her bill of complaint, filed on September 9th, 1922, she alleged that she was married to the defendant at Alexandria, Virginia, on November 4th, 1914, and lived with him until June, 1921, when at his request she joined in a sale of their joint property; that he gave her one-half the proceeds of that sale and thereafter, in June, 1921, he deserted and abandoned her without just cause, although he provided an apartment for her, paying rent at the rate of $50 a month therefor, and since then has continued somewhat irregularly to send her $10 a week for the mantenance of herself and child; that there were two children of the marriage, both living, both boys, one aged six and the other five years, and that the father had taken the younger boy to live with himself and his family; that there was no valid reason why the defendant should live apart from the complainant or why he should not re-establish their home. She further stated that he had a salary of about $300 a month with an automobile company, and some additional income.

Defendant, in his answer, denied the substantial averments of the bill, charging him with abandoning the complainant without cause. He also denied that he earned a salary of $300 a month plus commissions.

Testimony was taken in connection with the issues formed by these pleadings and, after a hearing, the court, on March 19th, 1923, ordered "that the defendant, Paul Meginniss, pay to the complainant, Ida Meginniss, his wife, for her sup-

port and maintenance of their child, Paul Meginniss, Jr., the sum of $25 a week as permanent alimony," and also ordered that the custody of the infant, Paul Meginniss, Jr., be awarded to the complainant, and that the custody of the other child be given to the mother of the defendant, the court retaining jurisdiction over both children and allowing reasonable access of each parent to each child. From that order this appeal was taken.

The only question presented by the appeal is whether the evidence in the case was sufficient to warrant the court in passing that order.

Before discussing the weight and the effect of the evidence, we will refer to the testimony of the several witnesses in the case. The complainant, after testifying to her marriage and the birth of her two children, said that she lived with the defendant until their home was sold in 1921; that she consented to sell the home because he had asked her to do it and had promised her that if she did it he would bring back to her their youngest child whom he had taken away some time before; that after the home was sold she told him to take her to her uncle's place in the country, where she would stay a couple of weeks until he could find a place for her. When he came out to see her there she asked him to take her "in town" that she couldn't stand it there any longer, and that he then took her to her father's, where she staid for about six months, during which time he paid her about $10 a week for the support of herself and child; that after that he took an apartment for her upon her agreeing to sign a release necessary to procure the sale of some part of his father's estate; that he secured an apartment on Garrison Avenue, but that he refused to come there, although he paid the rent for it; that on the first of the following January she received a notice to vacate that apartment and moved to a place on Bonner Road, for which she pays $40 a month. When asked what cause her husband had to leave her, she said "I don't know as I gave him any. He said when we sold the home

that we would get another place; everything would be lovely again; we would have our children together; he intended to do the right thing. He promised me faithfully he would."

She further testified that she expected him to come to the Garrison Avenue apartment to live with her but that he only came about once a week and then "he wanted me to be his wife in a way I didn't want to be when I wasn't living with him." She further testified that when she asked him for money for the support of herself and child he said "I was pretty; he was tired of paying my bills, I could get plenty other men to pay them, why didn't I get them." She further testified that aside from such money as he gave her she had no money for the support of herself and her child. She also testified that when he terminated the lease on the apartment he said he would send her the furniture, including her washing machine and sewing machine, but that he took them to his mother's and told her he was going to sell them, and that he had not given her any of the furniture at all. She also said that he was employed by the White Motor Car Company at a yearly salary of $3,000 and that he had some additional income from commissions and from an interest in the Baltimore Brass Building Company. She also denied that she ever abused or ill-treated him.

It also appeared that she had gotten for her interest in the house that was sold about $2,000 or $2,200, of which she had spent a considerable part.

One of the peculiar features of the case is the complainant's treatment of her second or younger child, and in her testimony she admitted that she had not treated it very well, but she explained that by saying that she was not in good health or she would not have done what she did, and intimated that she was at the time mentally unbalanced.

On behalf of the defendant, Dr. Ewalt, a practicing physician who attended the Meginniss family, testified that the second child was helpless and in a general anaemic condition from lack of nourishment, when it was taken from the complainant's custody.

Frank W. Radcliffe, an agent for the Society to Protect
Children from Cruelty or Immorality, said that he had been
asked to visit the complainant's home to ascertain the con-
dition of her youngest child, and that he made the investi-
gation on Monday, July 14th, 1919. That he found it "tied
in a high chair, emaciated, anaemic little thing, barefooted,
with one garment on," and that she said to him that she had
never wanted it and did not care how soon it died, and that
she hated it.

Mrs. John R. Seders, a neighbor, also testified to her
neglect of the child and said that she had called up the Society
for the Prevention of Cruelty to Children to have them send
some one out to see about it.

Caroline M. Whiting testified that she lived in the home of
the complainant for about a year in 1919 or 1920, and that
during her stay there she heard Mr. and Mrs. Meginniss
"fussing and quarrelling," and that their differences usually
arose from her attitude toward the younger child, and that
she neglected the child, and ill-treated it. She further testi-
fied that after the child had been taken away, she had heard
Mrs. Meginniss ask to have it brought back.

The defendant in his testimony said that, after he and
his wife went to live in West Arlington, things went along
"pretty smoothly," although she wanted to live more expen-
sively than his income would permit; that he was informed
about a year and a half before their place was sold that she
mistreated their younger child; that when the child was born
she did not care for it and that he hoped she would get over
it; that he had a "doctor from the Phipp's Clinic out there,
and he interviewed her, and his report was that she was noth-
ing but a Dr. Jekyl and Mr. Hyde." He further testified
that, after he took the little boy away, she refused to have
any further marital relations with him; that he offered, after
she had asked for the child to be brought back, to bring it
back if she would not mistreat it, but she refused to make that
promise.

The wife in her testimony denied that she refused to have marital relations with the defendant, until he had refused to live with her. The defendant further testified that he did not go to live with her at the apartment because she said she was done with him and did not want to live with him any more, and, quoting his testimony, he said, "all right, if that is the way you feel about it, all right, and since then I have not made any effort to go back because I would be afraid to go back now because there were times when we were living at Penhurst Avenue that she kicked me, once in a rather ticklish location, and knocked me out. I was coming up the cellar steps and she kicked me and I lay there for about two hours. And another time, she threw a cup at me and cut my head and I had a scar on there for months. And another time she picked up a knife and threatened to stick me and said there was no law that would touch her." In the course of his examination the witness was asked, after he had been questioned about paying for his wife's support: "Do you think there might be a possibility of reconciliation the moment the money is shut off? A. No, sir. I would be afraid because I have been threatened and I would be afraid to resume any relations at all."

This is substantially all the testimony, dealing with the principal issue involved in this case, given on behalf of the defendant. The only other thing which has any significance in that connection is Mrs. Meginniss's testimony that during the period following the birth of the younger child, when she was said to have neglected it, she was "a little off."

From this somewhat unsatisfactory and uncertain testimony, but three facts stand out clearly and unequivocally; one is, that the defendant did stop living with the complainant; and two, that he declares their separation is final and beyond any hope or expectation of reconciliation, and three, that she is willing to resume their former relations. It is conceded in the case that he has left her and that he will not return to her, and, without analyzing the testimony in detail,

it is sufficient to say that in our opinion it contains nothing to justify such conduct on his part.

The evidence in such a case as this ought, it is true, to be sufficient to warrant the court in granting a divorce *a mensa et thoro,* and such a divorce ought not to be granted upon the uncorroborated testimony of the complainant, but the facts to which we have referred are sufficiently proved not only by the complainant's testimony, but by the testimony of the defendant's own witnesses. And under the circumstances of this case, giving due consideration to the fact that the able and careful judge who tried this case below had the advantage of actually hearing the testimony, we are reluctant to disturb the conclusion he reached, and in coming to that decision we are very much influenced by the positive and unequivocal statement of the defendant that he would not again live with the complainant. For as it was said by JUDGE BURKE, speaking for the Court, in *Muller* v. *Muller,* 125 Md. 76:

"Separation and intention to abandon must concur in order to constitute cause of divorce on ground of abandanment; *but they need not be identical in their commencement. Pinkaid* v. *Pinkard,* 14 Tex. R. 357.

"Although to constitute desertion, there must be a simultaneous separation and intent to desert, and desertion does not exist without the presence of both, the two need not begin together, but the desertion begins whenever to either one the other is added. *Bishop, Marriage and Divorce,* vol. 1, sec. 1696; *Taylor* v. *Taylor,* 112 Md. 666.

"Now, the question to be decided is: Do the facts contained in the record show that the appellee abandoned the appellant within the meaning of the statute, as defined by the authorities referred to? If he did, she is entitled to the divorce prayed for. That the appellee separated from his wife in December, 1912, is proved and is not denied. The cohabitation was ended then, and has never been resumed. No explanation or excuse has been offered for his continued

absence or failure to support and protect his wife. The intention to abandon must be deduced by the court from the facts and circumstances of the case."

Counsel for the defendant also contended that the allowance made by the trial court by way of alimony for the support of the complainant and her child is improper and excessive, but, after a careful examination of the testimony, we find nothing in the record to support that contention, and we may add that we fully agree with the lower court in the provision made in the order for the disposition and custody of the children.

For the reasons stated above, it follows that the order appealed from will be affirmed.

*Order affirmed, with costs to the appellee.*